**McCLAYTON v. W. B. CASSELL CO.**

Civil Action No. 2978.

District Court, D. Maryland.

June 1, 1946.

166

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., Virgil Van Street, Asst. U. S. Atty., of Catonsville, Md., and William D. Macmillan, of Baltimore, Md., for plaintiff.

Bowie & Burke, of Baltimore, Md., (by Edward H. Burke, of Baltimore, Md.), for respondent.

CHESNUT, District Judge.

The petition in this case seeks the enforcement of a veteran's rights as to reemployment. On November 30, 1943 the petitioner, William R. McClayton, then over fifty years of age, was commissioned a Lieutenant Commander in the Naval Reserve. Upon his discharge therefrom he received a certificate of satisfactory service on December 18, 1945. At the time of receiving his commission and entering the active service of the Navy he was the first vice president of the respondent, The W. B. Cassell Company, a Maryland corporation, and he continued to hold that office until August 1, 1944, when he was removed therefrom by the directors of the corporation in consequence of certain activities to be hereafter related. Promptly after his discharge from the Naval Service he applied for reinstatement or reemployment. This was refused by the action of the directors of the corporation. This petition was then filed under the Selective Training and Service Act of 1940, § 8, as amended, 50 U.S.C.A.Appendix, § 308. At the hearing of the case counsel for the respondent contended that the applicable law, if any, was 50 U.S.C.A.Appendix, § 403, a part of the Army Reserve and Retired Personnel Service Law of 1940. Counsel for the petitioner then amended the petition to include the rights, if any, under this latter section. As the provisions of the statutes are similar (with an exception not material here) it is unimportant in the case which section is properly applicable to the suit. The Selective Service Act applies to persons who are "inducted" into the service. The Retired Personnel Service Law applies to persons in the Reserve Land or Naval Forces on active duty. It seems therefore the latter Act is the one here properly involved.

The respondent contends that neither section is applicable to the petitioner's case for numerous reasons. In the view of the case hereinafter stated it will be sufficient to consider only three of the provisions of the respective statutes. Both provide that the veteran to be entitled to reemployment (1) must have "left or leaves a position, other than a temporary position, in the employ of any employer * * * (2) is still qualified to perform the duties of such position" and (3) the employer is not required to furnish reemployment if "the employer's circumstances have so changed as to make it impossible or unreasonable to do so".

From the testimony and exhibits at the final hearing of the non-jury case, I find the following facts material to these three conditions of the statutes.

1. The business of The W. B. Cassell Company was founded in Baltimore City about fifty years ago by W. Barry Cassell. It consisted chiefly in the purchase and sale of or brokerage transactions in food products obtained from numerous suppliers of such commodities. In 1908 Mr. Cassell employed the petitioner, William R. McClayton, then a youth of 16 years of age, as a stenographer and general utility assistant in the business. He proved himself industrious and efficient and soon became active in sales promotion. From time to time his compensation was materially advanced until in 1928 he was receiving compensation at the rate of $5,000 to $6,000 a year. Mr. Cassell then determined to give him a substantial interest in the business. This was done by incorporating the business. Mr. Cassell sold his interest in the physical assets to the corporation in consideration for $100,000 promissory notes, and 1,000 shares of the common stock of the corporation, each of the par value of $100 were issued, 510 shares to Cassell and 490 shares to McClayton. Shortly thereafter McClayton transferred 30 shares of his stock to certain other employes. The corporation had five directors including Cassell, McClayton and three employes.

Cassell· was elected president and McClayton vice president. They were paid salaries by the corporation in varying amounts over a period of years, the salaries in 1943 being $15,000 to each. Of the $100,000 notes given by the corporation to Cassell, $90,000 was paid in cash and the remaining $10,000 note was surrendered without required payment. In 1944 the gross sales of the corporation were about $1,500,000.

2. From 1928 to 1943 the corporation continued generally to be profitable; but when McClayton was called to duty in the Navy a difficult situation arose with respect to the future active management of the business. Mr. Cassell was then 73 years of age and at times was incapacitated by sciatica. In the absence of McClayton the more active and aggressive duties of management and promotion of sales had fallen upon Harry R. Gilner, a younger employe who had been trained in the business by both Cassell and McClayton. He also had proved himself efficient and reliable. As he then had no proprietary interest in the business and its profits in addition to his salary of about $6,000 a year, he told Mr. Cassell that he would expect after the war, then in progress, to leave the employment and go into business for himself in view of the financial needs of his already large and growing family. The problem as to continued successful active management of the business, in the indefinite absence of McClayton, was further accentuated, at least from Cassell's standpoint, by the fact that in 1942 and 1943 McClayton had been successively an unsuccessful candidate for election first as a Representative in Congress and later as Mayor of Baltimore City, without prior consultation with Cassell and arrangements for continued active management of the business which obviously required McClayton's whole time, which would have been impossible if he had been elected to either office. In addition, in 1942 McClayton first seriously considered service with the Government in the Office of Price Administration but subsequently declined it. However, he did for six weeks became connected with the Bureau of Economic Warfare from which he resigned. He also had considered service in the Amgot which, if he had entered it, very prob-

ably would have entailed long absence from the business. Finally, as has been stated, in December 1943, he was called to active service in the Navy for an indefinite period.

3. Cassell and McClayton conferred by correspondence and in person regarding the management situation. Cassell pointed out to McClayton that the condition was quite similar to that which had existed in 1928· when McClayton was given a nearly one-half interest in the profits of the business through stock ownership. He suggested to McClayton that a somewhat similar arrangement should now be made for Gilner in order to retain indefinitely if possible his active management of the business during McClayton's absence, and his continued participation in it thereafter. Concretely, he suggested that the authorized stock should be increased by the issuance of 500 additional shares of common stock to be sold to Gilner at $120 per share. At a personal conference in Baltimore between Cassell and McClayton, and Howard Schnepfe, the corporation's accountant, Cassell understood that McClayton in principle at least had agreed to this arrangement, but correspondence immediately thereafter developed a dispute about it, and subsequently McClayton definitely disagreed, taking the view that if additional stock were to be issued other employes than Gilner should participate therein. After lengthy and seemingly futile correspondence to reach an agreement, Cassell as majority stockholder, decided that it would be necessary to effect a change in the personnel of the directors of the corporation and notice for the postponed annual meeting was given to be held on June 26, 1944. McClayton attended this meeting and on learning that it was Cassell's intention to make a change in the personnel of the Board became much incensed. Nothing was done at this meeting as it developed that there was a defect in the notice therefor. Another meeting was then duly noticed for July 15, 1944. At this later postponed annual meeting of the corporation the five directors newly elected were Cassell, McClayton, Gilner, Mr. Edward H. Burke, counsel for the Company, and his secretary. McClayton attended this stock-

holders meeting and voted his 490 shares, including the 30 shares transferred to other employes, in favor of a different set of directors.

4. In the meantime, however, McClayton without prior communication with Cassell and without his knowledge, wrote and mailed a long letter dated June 27, 1944 to all the employes of the corporation, and also sent a copy of it to about 19 of the corporation's suppliers of merchandise and customers, and including the Baltimore bank of the corporation where it had important credit relations. This letter, after reciting the proposed changes in the Board of Directors and in effect criticizing Mr. Cassell's proposal as unfair to the employes, and especially to the three who had been directors of the Company, and intimating that there was to be some unfair change made in the bonus compensation to employes, concluded as follows:

"There is something you can do about it, if you are willing to go 'all out' with me in an endeavor to safeguard your job, obtain fair reward for your services and loyalty and protect my minority interest. That is to see the old Board of Directors reelected. If you favor the old Board, please let me hear from you *at once*. This calls for action, it is urgent, do not delay."

5. This letter was not written to the employes as stockholders. In fact only three of about twenty or more were stockholders. The obvious tendency of the letter and apparently its actual intention was to stir up dissatisfaction on the part of the employes of the corporation and apparently to enlist their support in some way in putting pressure upon Cassell as majority stockholder and to further McClayton's interests as minority stockholder of the corporation. There was no proper basis or occasion whatever for sending the letter to the bank with which the corporation did business and to its suppliers and customers. The natural tendency was to create difficulties for the corporation in the successful conduct of its business. The letter was sent out by McClayton when he was first vice president of the corporation and owed it the loyalty of his support with respect both to employes and business associates. Cassell did not learn about McClayton's

letter of June 27, 1944 until after the stockholders' meeting of July 15, 1944.

6. Further light is thrown on the import and intention of McClayton's letter of June 27 by his letter dated July 18, 1944 written by him to the Cudahy Packing Company at Chicago. One of the most important items of merchandise handled by The Cassell Company was "Clix", an improved lard product put out by Cudahy. The Cassell Company had been distributors for this product for many years past. The volume of its sales in 1944 represented about 22% of all the merchandise handled by the Cassell Company. In that year Cassell paid to Cudahy for Clix (and possibly some other less important articles) $341,178. A copy of McClayton's letter of June 27, had also apparently been sent to Cudahy. McClayton's expressed object in writing to Cudahy was to induce it to withdraw the sale of Clix to Cassell and to transfer the Baltimore business to a new company to be organized by McClayton to be known as the Free State Sales Company. Among other things the letter charged that Cassell as majority stockholder had taken unfair advantage of McClayton in electing a new Board of Directors, but that the entire sales force of the Cassell Company "insist I begin now to build a new organization". The letter also indicated that the present employes of the Cassell Company would go into the new company with McClayton, and that while McClayton was still in the Navy he would meet with and advise these men every week, giving the business the same close attention as when he was in Baltimore, but that the active day by day administrative work would be done by James Doukas, then senior salesman for the Cassell Company. He proposed to send Doukas to Chicago to confer with Cudahy. As a result of this letter representatives from Cudahy came to Baltimore and conferred first with McClayton and later with Cassell and Gilner. The Clix business was, however, in fact not transferred from Cassell. Another large and important supplier of goods sold by the Cassell Company was the Bisbee Corporation, a dealer in linseed and salad oils. The dollar amount of their business handled by the Cassell Company in 1944 was

$169,411. McClayton conferred with Doukas and the latter with McClayton's knowledge and without his disapproval, visited the Bisbee Corporation in Philadelphia, apparently to have its business as a supplier to the Cassell Company transferred to the new company to be formed by McClayton.

7. McClayton's letter to Cudahy was not learned of by Cassell until a day or two before the trial of this case when it came to his attention in consequence of the request of counsel for the production of certain papers. But when Cassell did learn shortly after June 27, 1944 of McClayton's letter of that date to employes and business suppliers and the bank, a special directors' meeting of the corporation was called for August 1, 1944 and was attended by all the directors except McClayton. Cassell called to the attention of the directors McClayton's letter of June 27, 1944, with the comment that it might result in hurting the Company's credit and business. Thereupon by vote of the directors, McClayton was removed as first vice president and Gilner was elected in his place. At a subsequent meeting McClayton was also removed as a director of the corporation. The validity of these corporate actions under the Maryland statutes are not challenged by counsel for the petitioner in this case.

8. When McClayton went into active service with the Navy in December 1943, Cassell proposed that the corporation should continue to pay McClayton's salary of $15,000 a year less his salary received from the Navy of about $5,000. McClayton says that he declined this offer in this form but agreed that the excess should be credited on a note which it is said the corporation had previously given to McClayton in consideration for salary earned but not paid, a similar note and amount having at the same time been given to Cassell.

9. Testifying as a witness in the case McClayton said that he had been greatly incensed at Cassell's action as majority director in changing the personnel of the Board of Directors and proposing to authorize and sell to Gilner additional shares of stock; and that his action in writing the letters of June 27 and July 18, 1944, was due to his anger at the time but that at the present time he held no personal animosity to Mr. Cassell and had concluded that he had been and still was simply badly advised. It is difficult to reconcile this professed attitude of the petitioner toward Mr. Cassell with some of the correspondence and particularly a communication sent by McClayton to Cassell, undated but probably in the latter part of 1944. In this communication he quoted extracts from letters which he, McClayton, said he had received in response to his letter of June 27 to various employes of the corporation, and from other business concerns to which the letter had been sent. The general purport of these extracts was to ridicule and disparage Cassell. McClayton also testified that he had not pursued the plan outlined in his letter of July 18, 1944 to Cudahy to form a new and competitive corporation and that he had, in subsequent conference with some of the Cassell employes dissuaded them from leaving its employ because he had concluded that his own best interest was to protect his property rights in the corporation.

As a fact I find that McClayton's correspondence and activities of disloyalty to the corporation while he was still its first vice president, have caused little, if any, actual monetary loss to the corporation and have had little, if any, effect on its business success, other than the natural annoyance, trouble and embarrassment caused to Cassell and the necessity on his part of explaining the real situation from his standpoint to his employes and business associates. Nevertheless I also find as a fact that the natural tendency and the intended effect of McClayton's activities while an officer of the corporation were highly prejudicial and disloyal to it and constituted just and adequate reason for the removal of McClayton as an officer of the corporation.

From the facts above stated I conclude as a matter of law (1) that the petitioner was not, when he applied to the Cassell Company for reemployment, then "still qualified" to perform the duties of an officer or manager of the Cassell Company. It is not questioned that he was physically able to discharge the duties, but the position of a managerial officer of a corporation requires mental and temperamental elements

consistent with harmonious relations and mutual trust and confidence on the part of the several managers who must work together. It is clear that McClayton's activities were disloyal to the corporation and personally antagonistic, without cause, to Cassell. As a majority stockholder Cassell had the perfect legal right to effect a change in the personnel of the Board of Directors. Whether it was wise to do so was a matter of judgment in which the law gave him the authority to act. In so doing, he performed no act that was hostile to or legally unfair to McClayton, and as a matter of purely business judgment Cassell was not only entitled to exercise his rights as a majority stockholder but there were many business reasons which seemingly support the wisdom of his judgment as to the necessity of providing for continued active management of the corporation by Gilner in view of McClayton's indefinite absence. Certainly the development of the matter brought about by McClayton's own activities justified the conclusion of the directors of the corporation that McClayton could no longer successfully perform the duties of the chief active manager of the corporation in association with Cassell, still the president and directing head. It seems only reasonable to conclude that an important officer of a business corporation who has taken active steps (even though subsequently abandoned) to form a rival corporation and to disrupt the administration of the former by enticing its employes to. a competing business, is not temperamentally qualified to continue as an active manager of the business. Such inharmonious relationships with its managerial associates would naturally result in personal lack of cooperation with consequent detriment to the business itself.

■ (2) For quite similar reasons I also conclude that the circumstances affecting the business of the corporation were so changed that it would be *unreasonable* for it to reemploy or restore the petitioner to his former position. The change in the circumstances were brought about by McClayton's own voluntary activities.

■ (3) The last of the three conditions above stated requires more extended consideration. Sections 308(b) and 403(b) both provide as follows: "In the case of any such person who, in order to perform such active duty or such service, has left or leaves a position, other than a temporary position, in the employ of any employer," etc. The question is whether the petitioner's case is within the wording of this fundamental requirement. The respondent says it is not because (a) the petitioner did not *leave* a position, in order to perform Naval duty; (b) that the position he held was a *temporary* one and (c) it was not a position *of employment*. Counsel for both parties are in agreement that the case presented is at least a very unusual one under the statute. There is also no disagreement that the statute should be liberally construed to effectuate its important purposes of policy to assure employes of an opportunity to resume a compensated job which they have left to serve their country in time of war. Kay v. General Cable Corp., 3 Cir., 144 F.2d 653. It is also clear enough that in applying the wording of the statute to the facts of a particular case no mere linguistic infelicity should be sufficient to defeat the main purpose of the statute when looked at as a whole in the light of the important public policy subserved, which was to enhance the morale of the Naval and Military Services of the United States. Too much emphasis therefore must not be placed upon the mere literal wording of the statutes. Nevertheless insofar as the language used is clear, it must control.

■ The respondent contends that the position which the petitioner held in December 1943 was only a *temporary* one in that he had previously been elected as first vice president of the corporation for a limited period only, that is to say, until the next annual stockholders' meeting to elect new directors who in turn would select for the succeeding year the officers of the corporation. More specifically, it is pointed out that under the Maryland corporate law annual stockholders' meetings are to be held at which time directors are elected to serve for the ensuing year. In turn the new Board of Directors elects its own officers. Therefore it is said that the petitioner was elected to his position as first vice president of the corporation for only a limited period of one year, and therefore held only a temporary position. In a sense the argument.

is plausible but I am not satisfied from a reading of the statute as a whole and bearing in mind its full purpose that the word "temporary" should be given the particular meaning contended for. The statute does not define the word "temporary" in this connection. Its ordinary dictionary meaning is for a limited as contrasted with an unlimited or indefinite period. It will not be denied that the statute was intended to cover the cases of employes compensated whether by the hour, day, week, month or year. In one sense the period of employment of such employes may be considered temporary; but that clearly was not the sense in which the term was intended to be applied in these statutes. The Court of Appeals for this Fourth Circuit has recently held that a "seasonal" employment only may be considered as "other than temporary" under the Act. United States ex rel. and for Use and Benefit of Stanley v. Wimbish, 154 F.2d 773. While it is not either necessary or desirable to herein undertake to define the force and effect of the word "temporary" for cases other than the instant one, I take the view that such position as the petitioner held was of more than a temporary character. In fact he had held this position for at least 15 years and doubtless would have continued to hold it indefinitely in the future if he had not engaged in his activities so disloyal to the corporation. It is true that the directors at any annual meeting could have either abolished his position or elected some one in his place; but without the change in circumstances above mentioned it is not likely that they would have done so for an indefinite period in the future. With respect to the facts of the case, therefore, it seems reasonable to interpret the phrase "other than temporary" as including a position held at mutual will to continue until terminated by either party. That is the sense in which the word is evidently used with regard to employes generally. It may also be pointed out that the by-laws of the corporation provide that officers once elected shall hold their office until their successors have qualified.

But there is more force both literally and substantially in the respondent's point that the petitioner did not *leave* his position in order to perform Naval service. In fact he continued by correspondence and personal return from time to time from Norfolk, where he was stationed, to Baltimore to act as director and officer of the corporation. Whether his salary was continued is immaterial in this connection. Ordinarily, of course, the compensation of an employe who goes into the Military or Naval Service is discontinued at least during his absence. Certainly there is no obligation under the statute to continue it. The abolition of his particular office and the election of Gilner in his place was not caused by his absence from Baltimore but directly and proximately by his own activities. True it is that his absence emphasized the importance, for the successful continuation of the business, that some arrangement should be made to bind Gilner to the corporation more effectively. But neither Cassell's judgment that this should be done nor his action to pave the way for the legal accomplishment of that objective would itself have interferred in any way with the petitioner's position in the corporation either as an officer or as director, if he had not voluntarily resorted to efforts to injure the corporation due to his legally unjustified anger toward Cassell.

The Assistant United States Attorney acting as counsel for the petitioner under section 403(d) argued as a matter of law that in applying the statute the court must disregard any facts, conditions or actions of the petitioner during the time he was in the Service. In support of this contention reference is made to Anderson v. Schouweiler, D.C.Idaho, 63 F.Supp. 802, and Dacey v. Bethlehem Steel Co., D.C. Mass., 66 F.Supp. 161. Without questioning the results reached in these cases, involving facts quite unlike the instant case, it is my view that the contention so broadly stated is not sound. Clearly to be entitled to reemployment, the employe must be "still qualified" to perform the duties of his position. Intervening physical or mental disqualification would justify a refusal to reemploy. Similarly it would seem that voluntary activities of an employe in the interval which clearly demonstrated his unfitness to serve his employer in the old position would disentitle him to reemployment. Of course the validity of the refusal to reemploy on this ground is dependent upon

the facts of the particular case and does not depend upon the mere personal view of the employer. That is to say, it is a question of fact in each case to be determined by the court on the evidence.

■ Nor can we ignore the plain fact that the petitioner did not either literally or substantially leave his position to perform Naval services when as a matter of fact he continued to hold the position for at least seven months after his entry into the Naval service. Therefore whether the condition is viewed in the light of its literal wording or in the more substantial aspect of the causal relation between the entry into Naval service and the loss of the office, we find that the petitioner's case does not meet the necessary condition.

■ A further substantial objection to the petitioner's case involves the proper connotation of the word "position" as used in the statute. That word has many dictionary meanings. The one most applicable is "employment" because by the wording of the clause the position referred to is one "in the employ of any employer". An officer of a corporation is not, at least in the ordinary sense, an employe of a corporation. This distinction between the two words, officer and employe, has been clearly stated by the Maryland Court of Appeals in Shriver v. Carlin & Fulton Co., 155 Md. 51, 58; 141 A. 434, 58 A.L.R. 767. As appears from that case, an officer may also be an employe but only where the facts show that in addition to his status as an officer he has also been employed in a separate capacity for particular purposes. In the instant case there was no contract either oral or written for employment of the petitioner by the respondent. His only duties were prescribed by the by-laws of the corporation, and his salary was fixed by the directors. It is true that as a matter of custom, as in most ordinary business corporations, the active conduct of the business is carried on by the officers, and it is their diligence, industry and success in so doing that causes their election and reelection from time to time by the directors as officers. Here again, however, it is not intended to put too much stress upon the verbal distinction between an officer of a corporation and an employe; nor upon the consideration advanced by counsel for the respondent that the officer is elected by the directors and an employe is merely appointed by the officers. Conceivably there may be cases arising in which in substance, as evidenced either by written or oral contracts of employment, a person nominally an officer is really an employe of the corporation, and so entitled to the protection of the statute. But the facts of the instant case do not bring the petitioner's case into this substantial aspect of the statute as contrasted with its mere wording. There is, of course, a very real difference between an employer and an employe. The employer represents in general management, and the employe labor, whether it be ordinary unskilled labor or skilled labor or even professional in character. In the instant case the petitioner's status was that of management and not that of labor. The controversy that has arisen is not between management and labor but within management itself. In essence it may be said to have been only a stockholders fight in which the majority legally prevailed.

Counsel for the petitioner argues that in this case the court should look through form to substance, or as it is sometimes said, should pierce the corporate veil. No doubt this can very properly be done in some cases. But in the instant situation when we look through the corporate form to the substance and realities of the matter we find the substance is not different from the form. It is argued that this case is really a clash of wills between two men, Cassell and McClayton; and that McClayton's situation should be regarded as that of an employe by Cassell. But this is not a tenable view of the facts. Prior to 1928 when the corporation was formed, that was the real situation. But the very object of forming the corporation was to change the relationship theretofore existing, which was that of employer and employe, to one which in economic reality was a partnership between the two men with respect to the profits of the business. And certainly neither partner is an employe of the other. In my opinion, under the facts of this case, McClayton did not hold

the kind of a position covered by the Act; but even if he did, his activities while still holding it, justified his removal by the directors and their refusal to reinstate him therein.

The most important question in this admittedly unusual case is whether an officer of the corporation having managerial status continuing to hold such position while he is serving simultaneously as an officer in the Navy, can, for misconduct in office, be removed permanently by the Board of Directors from the management of the company. The petitioner denies that he can be so removed and asserts that he must be reinstated in office upon the honorable termination of his Naval service.

 I think the Act would be misapplied under the facts of this case. Its intended coverage includes any person who leaves a position to perform military service. But, as pointed out, this is not literally true of the petitioner. The mere literal scope of the Act should yield in any case where its wholehearted construction requires the precise meaning of individual words to give way to the evident purposes of the statute. The mere circumstance that the petitioner retained his office in the corporation for some months after entering upon active Naval duty would not prevent a finding that he had left his position to enter the Service if it were found that the true cause of his eventual removal was due to his necessary absence, or any other reason consequent upon his Naval service. But the facts in this instant case are quite different. In the course of a dispute over policy with the dominant stockholder, while still holding office and exercising his office, the petitioner made an intentional effort to wreck the business of the corporation in his own private interest. For that sole stated reason, which is a sufficient one, he was removed from office by the Board of Directors. He lost his position not because his Naval duties rendered him unable to perform it or retain it but because, in the performance of his office, he was guilty of acts of misconduct whose normal consequence, in any properly governed corporation, is removal from office.

 Whether the statute is viewed in its entirety and considered in the light of its evident purposes, or whether the several conditions essential to the petitioner's recovery are construed in the ordinary meaning of the wording used, the result is the same—the petitioner's case does not come within the statute.

 I conclude, therefore, that the petition must be dismissed without costs. Counsel may submit the appropriate order in due course.