**TRUSTEED FUNDS, Inc., v. DACEY.**

**No. 4218.**

Circuit Court of Appeals, First Circuit.

March 7, 1947.

Thomas H. Ray, of Boston, Mass. (William Shaw McCallum, of Boston, Mass., on the brief), for appellant.

Richard Maguire, of Boston, Mass. (Maguire & Roche, of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

This is a somewhat difficult veteran's reemployment case, brought under § 8 of the Selective Training and Service Act of 1940, as amended, 54 Stat. 890, 56 Stat. 724, 58 Stat. 798, 50 U.S.C.A. Appendix, §. 308. The reemployment benefits of this section were, by § 7 of the Service Extension Act of 1941, 55 Stat. 627, 50 U.S.C.A. Appendix, § 357, extended to persons who, subsequent to May 1, 1940, entered upon the active military or naval service in the land or naval forces of the United States, to the same extent as in the case of persons inducted under the Selective Training and Service Act. Relevant portions of § 8, as amended, are set out in the footnote.[1]

[1] "Sec. 8. (a) Any person inducted into the land or naval forces under this Act for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training and service under section 3(b) shall be entitled to a certificate to that effect upon the completion of such period of training and service, which shall include a record of any special proficiency or merit attained. * * *

(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

(A) if such position was in the employ of the United States Government, its Territories or possessions, or the District of Columbia, such person shall be restored to such position or to a position of like seniority, status, and pay;

(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; * * *

(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration. * * *

(e) In case any private employer fails or refuses to comply with the provisions of subsection (b) or subsection (c), the district court of the United States for the district in which such private employer maintains a place of business shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, to specifically require such employer to comply with such provisions, and, as an incident thereto, to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. The court shall order a speedy hearing in any such case and shall advance it on the calendar. Upon application to the United States district attorney or comparable official for the district in which such private employer maintains a place of business, by any person claiming to be entitled to the benefits of such provisions, such United States district attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing of any

416

Appellant Trusteed Funds, Inc., is a Massachusetts corporation organized in 1938. Its business is sponsoring certain trust plans for the establishment by investors or "founders" of individual trusts under a form of indenture of trust known as "Commonwealth Fund Indenture of Trust" wherein the National Rockland Bank of Boston is designated as trustee. A firm of investment counselors directs the trustee in the investment of funds. Two of the trust plans provide for monthly payments of $10 or multiples thereof spread over a 10-year period. From the periodic payments so made, Trusteed Funds, Inc., receives a commission of 7½%, called a "founding fee", which is paid monthly according to a fixed schedule. There are also plans calling for single lump sum payments of $500 or more, under which Trusteed Funds, Inc., receives a founding fee of 7½% deducted from the lump sum payments when made. The founding fees are used to pay all expenses of appellant, including selling expenses.

The company was organized by D. A. Griffith and his associates, Norman F. Dacey (appellee herein), and H. B. Paquet. Griffith became a director, and president of the company, Dacey became a director and one of the vice presidents, and Paquet also became a director and vice president.

On October 4, 1938, a five-year written contract of employment was executed by appellant and Dacey, under which Dacey was to serve as publicity manager "to manage and to supervise the publicity activities of the Company, and to perform such other duties and render such other services as may be required of him in the best interests of the Company, subject to the general direction and supervision of the General Manager of the Company and under the control and to the satisfaction of the Board of Directors of the Company." The company was given the option to extend the agreement for a further period of five years from October 4, 1943, upon the same terms and conditions, upon giving notice in writing of its intention so to do to the said Dacey on or before July 1, 1943. No such notice was ever given. Under the contract, Dacey was compensated solely on a commission basis. He received 7% of all the founding fee income of the company. By certain amendments executed on March 15, 1941, and May 12, 1942, he also received 50% of the founding fees derived from sales of plans effected by his personal efforts.

Similar five-year contracts were made by Trusteed Funds, Inc., with Griffith, who was employed as "General Manager", and with Paquet, who was employed, we infer, as "Sales Manager". Griffith received 11% of the total founding fee income of the company and Paquet 7%, the same as Dacey. This 25% of the aggregate founding fee income of the company was called the "X Account", or "Special Account", and was split between Griffith, Dacey and Paquet in the proportions of 44%, 28%, and 28%, respectively, another way of stating that Griffith received 11% of the total founding fee income of the company and Dacey and Paquet 7% each. Griffith and Paquet also each received 50% of the founding fees from plans sold by them personally.

As things worked out, Dacey's duties with respect to publicity were apparently in large part curtailed or eliminated by the Investment Company Act of 1940, 15 U.S. C.A. § 80a—1 et seq., Trusteed Funds, Inc., having registered with the Securities and Exchange Commission under that Act in March, 1941. Under the May 12, 1942, amendment to his contract, it was agreed that Dacey would continue to perform such services as had hitherto been performed by him, and in addition that he would undertake by direct contact and through his own efforts to sell the various trust plans offered by the company. Most of Dacey's time, according to his testimony, was devoted to sales work, recruiting salesmen and training them, and assisting them

motion, petition, or other appropriate pleading and the prosecution thereof to specifically require such employer to comply with such provisions: Provided, That no fees or court costs shall be taxed against the person so applying for such benefits. * * *"

in the field, also in assisting on the executive side of the business.

On June 25, 1942, at which time his contract had an unexpired period of about one year and three months, Dacey accepted a commission in the army and left for active duty. At this time he submitted to the board of directors a request for a modification and extension of his contract. The board declined this request, which was subsequently withdrawn. In December, 1943, Dacey's term of office as director expired, and a successor was elected. Also, one Frank J. Tibert was elected in his place as a vice president.

Upon his return from overseas in June, 1945, though he was not yet released from active duty, Dacey consulted Griffith and other officers of the company with reference to resumption of employment on his return to civilian life. Griffith offered him a resident vice-presidency at Providence, Rhode Island, or New York, with the responsibility of building up and heading a regional sales organization. Dacey rejected these offers, and insisted upon being restored to his old job. There was testimony to the effect that he also insisted upon resuming his offices as director of the corporation and vice president, which Griffith said was impossible. At one point in Dacey's cross-examination he flatly stated that he had told Griffith that he would "accept reemployment under no other conditions". Considerable heat was engendered in the negotiations at this time, but nothing was worked out.

Immediately upon his discharge from active duty, on January 28, 1946, Dacey wrote to the company formally requesting reemployment. This letter was not introduced in evidence and we do not know its exact terms. Under date of January 31, 1946, counsel for the company wrote to Dacey as follows:

"The second paragraph of this letter of January 29, in which you request reinstatement, is incorrect, in that I am informed Trusteed Funds offered you—on your return from the service—alternate employment, inasmuch as the position held by you as publicity manager had been virtually abolished by action of the SEC in limiting advertising of securities. As you know, when Commonwealth Fund was created in 1938, it was not registered with the SEC and consequently was not under the advertising ban. However, on qualifying with the SEC, Trusteed Funds became subject to its laws, rules and regulations, one of which—that in regard to advertising —made necessary the abolishment of the position of publicity manager. My object in writing you this is to avoid any possible misunderstanding.

You will further be informed that since you left for service no one else was or has been employed by Trusteed Funds as publicity manager."

On February 1, 1946, counsel for Dacey wrote to the company requesting that it clarify its position as to Dacey's reemployment. "He is not interested in the salesman's position you offer but only in being reinstated in the position he occupied prior to going into the service." What reply, if any, was made to this letter does not appear.

At the time of Dacey's return, Tibert, under contract of employment as assistant sales manager, was then the third executive participating in the "X Account" in place of Dacey. It appears that Griffith was receiving 40% of X Account, Paquet 33%, and Tibert 27%. In other words, Griffith was receiving an overriding commission of 10% on all the founding fee income of the company, Paquet 8.25%, and Tibert 6.75%. The company had prospered in Dacey's absence so that, with much increased earnings, these commissions, on a percentage basis, netted the recipients substantially larger incomes than was the case when Dacey left to go into the service.

On February 19, 1946, Dacey filed his complaint in the court below. The complaint sought a declaratory judgment that the contract between the parties was suspended by the war and by reason of the plaintiff's having entered the military service, with the result that the contract had one year and three months to run from January 29, 1946, and that the company had broken the contract by its refusal to reem-

ploy the plaintiff in his former position.[2] By subsequent amendment to the complaint, which the court allowed, Dacey also sought reinstatement to his former position on the basis of his rights under § 8 of the Selective Training and Service Act.

The district court ruled (66 F.Supp. 321) that Dacey had no right to resumption of employment under the contract; that in leaving voluntarily to enter the service, he had surrendered his contract rights; that so far as the contract itself was concerned, "it has terminated either through the action of the parties or by its own time limitation." The correctness of this ruling was not questioned before us.

With respect to the claim under § 8 of the Selective Training and Service Act, the court found that Dacey had left his position to enter the military service, that he had seasonably made application for his old position, that he had the certificate of service and training with the armed forces, and that "he is qualified to resume the position which he seeks." It ruled that, pursuant to § 8, Dacey was entitled to reemployment in the old position he had held under the expired contract, adding that his "right to be a director or a vice president of the defendant corporation is not one which this court has the power to decree for that is something which is entirely in the hands of the stockholders." Since on the date Dacey left to enter the service he was participating in the "X Account" on an equal basis with Paquet, the court ruled that Dacey was entitled to recover as interim damages "the same amount of money which has been paid to Paquet between January 29, 1946, and the day when plaintiff is returned to his old position." The district court's judgment embodying these rulings was entered June 26, 1946, and is the subject of the present appeal.

In attacking this judgment, appellant's first and foremost contention is that the position Dacey left to enter the service was not a position "other than a temporary position" in the employ of any employer, within the meaning of § 8; and hence that

Dacey was not in any event entitled to reemployment pursuant to the Act. It is argued that a veteran is entitled to reemployment only where the position he left was a permanent one, that is, where the hiring was for an indefinite period, terminable at any time at the will of either party without cause; that if the applicant had been hired under a contract of employment for a definite period the position must be deemed "temporary", with the result that the employee's rights are to be governed solely by the terms of the contract.

We think the foregoing is too narrow a reading of the Act, the terms of which should be "liberally construed for the benefit of those who left private life to serve their country in its hour of great need." Fishgold v. Sullivan Drydock & Repair Corp., 1946, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111. The important thing is the nature of the position rather than the terms of the contract of employment under which the employee's compensation in that position may be fixed from time to time. An extra clerk hired during the holiday rush is obviously employed in a "temporary" position, whether he is hired at will or under a contract guaranteeing him employment at a certain rate from December 1 to January 15. A substitute employee hired during the absence of a regular employee on a year's leave is also employed in a "temporary position" whether he is hired at will or under a contract promising him employment for one year. Cf. Salzman v. London Coat of Boston, Inc., 1 Cir., 1946, 156 F.2d 538, certiorari denied 67 S.Ct. 501. On the other hand, a production employee in a factory would be regarded as having a permanent position, though the terms of his employment, and his tenure as against discharge without cause, are governed and protected by a collective agreement between his labor union and the employer having a definite period to run. In the case at bar Dacey, along with Griffith and Paquet, founded the company. Their compensation, on a commission basis, would be modest at the outset, but it was to

---

[2] The jurisdiction of the complaint, in this aspect, was based upon diversity of citizenship, it being alleged that the plaintiff was a resident of the State of New Hampshire.

be foreseen that as their efforts built up the earnings of the company their incomes from commissions would proportionately increase. It must have been contemplated that their employment with the company would be continuous, for the indefinite future, and that their respective contracts would be renegotiated and renewed from time to time as a matter of course (as indeed was done in the cases of Griffith and Paquet). The positions were expected to be continuous ones, provided the relationship proved to be mutually satisfactory. This is none the less true because of the fact that the company (§ 8 apart) could terminate the employment by refusing to renew the contract upon its expiration. The same may be said of an ordinary workman employed at will; it may be apparent from the circumstances attending the creation of the employment that the position was expected to be continuous, for the indefinite future, and notwithstanding the right of the employer to terminate the employment at any time such position is one "other than a temporary position" within the meaning of § 8. In either case the effect of § 8, enacted by Congress under its broad war powers, is to impose upon the employer an obligation he had not contracted to assume—an obligation to reemploy the veteran, and not to discharge him without cause within one year after such restoration. In either case the veteran may need the statutory protection. The two cases present no difference in principle. In Fishgold v. Sullivan Drydock & Repair Corp., supra, the Supreme Court expressed no doubt as to the constitutionality of the Act, nor do we have any doubt on that score. Cf. National Labor Relations Board v. Waumbec Mills, Inc., 1 Cir., 1940, 114 F.2d 226, 235, 236; Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A. L.R. 1217. The qualification in § 8 to the effect that reinstatement is not required where "the employer's circumstances have so changed as to make it impossible or unreasonable to do so", certainly removes any question as to the validity of § 8 under the due process clause.

▉▉▉ Alternatively, appellant claims that it fully discharged its obligation under the Act by offering to Dacey "a position of like seniority, status, and pay", which Dacey refused. The district court made no findings on this point. We cannot say that the evidence as a matter of law would require a finding that appellant had made an offer of a position of like seniority, status, and pay. Apart from the fact that the position offered was to be in another city, which might be a relevant factor, see Salter v Becker Roofing Co., D.C.M.D.Ala.1946, 65 F.Supp. 633, the new job would have required Dacey to start from scratch, recruiting a sales force, and building up the business in the region assigned. Though he would have been compensated by an overriding commission on all the plans sold through the regional office, he would not have received a percentage of all the founding fee income of the company, which was an attractive feature of his old position, and which continued to be an incident of the positions held by the other organizers of the company, Griffith and Paquet. Griffith testified that he offered Dacey a drawing account of $125 a week, which would have given Dacey a minimum yearly compensation of $6,500, and which was slightly more than his best year's earnings before he went into the service. Dacey testified that he had no recollection of having been offered such a drawing account. Even if a drawing account in that amount was offered, it would still not have rendered the new position one of "like pay", with the old. This is so because the old position was compensated on a basis of a percentage of all the founding fee income of the company, which with the expanded earnings would have amounted to considerably more than $6,500 per year—a benefit which, we may assume for purposes of the present point, Dacey would have shared along with Griffith and Paquet had Dacey not gone into the army. Under the Act, the veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war." The veteran's "service in the armed services is counted as service in the plant so that he does not lose ground by reason of his absence." Fishgold v. Sullivan Drydock & Repair

Corp., supra, 328 U.S. at pages 284, 285, 66 S.Ct. at page 1111.

Another defense put forth by appellant is that its circumstances had so changed during Dacey's absence as to render it "unreasonable" to require restoration of Dacey to his former position.

One changed circumstance relied on was the great increase in the company's earnings in the interim, which, it is argued, would make it unreasonable to take Dacey back at his old percentage of the founding fee income. But the company did not regard it as unreasonable to renew Paquet's contract at even a slightly higher percentage despite the increased earnings. When Dacey returned, 25% of the founding fee income was still being drawn off into the "X Account" to be divided between three top executives. They were sharing in the increased prosperity of the company. The only difference was that the third member of this favored triumvirate was now Tibert in place of Dacey.

If Dacey were otherwise entitled to be reemployed in his old position, his rights under the Act would not necessarily be defeated by the fact that the company had meanwhile entered into inconsistent contractual commitments with Tibert. The district court was warranted in finding, as it did, that this was not such a changed circumstance as would render it unreasonable to require Dacey's reemployment.

A further alleged change in circumstances which appellant relied upon was that Dacey's job as "publicity manager" had ceased to amount to anything after the company had registered with the Securities and Exchange Commission under the Investment Company Act, and that therefore nobody had been employed as publicity manager in Dacey's place. Of course the title given the position is not conclusive. Dacey's contract, in addition to assigning to him the management of the publicity activities of the company, also provided that he should perform such other duties as might be required of him in the best interests of the company under the supervision of the General Manager. It appears that he held an active position at the time he left to go into the army. The district court found that his "principal work was selling, and recruiting and training salesmen." In his capacity as a salesman he would not have participated in the "X Account". His duties of recruiting and training salesmen may perhaps have overlapped somewhat the functions of Paquet as Sales Manager. Perhaps the company sanctioned this overlapping to keep Dacey busy after the enforced shrinkage of his activities in the publicity field, when it would not have kept him on in that capacity but for the existence of the contract of employment with several years to run. Perhaps Dacey had become in actual function the assistant sales manager. Tibert, who had been with the company since 1940 as a salesman, was made Assistant Sales Manager in 1944. Perhaps he took Dacey's place, with a title more accurately descriptive of Dacey's actual functions, there being no longer any need of a publicity manager. We say "perhaps" in these matters, because they are not covered by the judge's findings and do not stand out too clearly in the evidence. Since the case will have to go back for a new trial, for a reason about to be stated, it will be open to the company to establish by evidence, if it can, that the position held by Dacey at the time he went into the army had become a more or less superfluous or overlapping one, and that, his contract of employment having run out, it would now be unreasonable to require his reemployment in his old position.

It was also pleaded as a defense that Dacey was unfit and unqualified for the position; that his services in the past had been disruptive of the company's best interests and had caused dissatisfaction among the employees of the company; that the directors had determined not to reengage Dacey's services when his contract expired. As already noted, the trial court found that Dacey "is qualified to resume the position which he seeks." But for several reasons we are unable to accept this finding:

(1) Prior to making such finding the court had ruled that "qualified" under § 8(b) "means simply physically and mentally qualified". We think more is required than that, and we agree with the conclusion

of Judge Chesnut in McClayton v. W. B. Cassell Co., D.C.Md.1946, 66 F.Supp. 165, 170, that "the position of a managerial officer of a corporation requires mental and temperamental elements consistent with harmonious relations and mutual trust and confidence on the part of the several managers who must work together."

(2) Presumably because of the restricted view it had taken of the word "qualified", the court ignored testimony to the effect that Dacey, when he returned in June, 1945, had made irresponsible charges that the company was headed for disaster and that its officers and directors had involved it in difficulties with the Securities and Exchange Commission because of certain illegal activities; had threatened to discredit certain of the directors, to "rule or ruin" the company, and to "mow down" opposition; and had intrigued to disrupt the organization and particularly to supplant Griffith as president and general manager. There was some conflict in the testimony on these matters but the district court made no findings thereon.

(3) The court erroneously excluded certain testimony which we think was relevant to the issue whether Dacey was qualified for the position. The company offered to prove that by his actions prior to leaving for the service Dacey had "disturbed not only the personnel but the complete organization of the defendant"; that he had "disturbed our relations with the Rockland National Bank, the trustee, with Studley, Shupert & Company, our investment counselors, and the John Hancock Insurance Company, as well as innumerable people with whom we did business, to such an extent that all of them have notified, as witnesses will be here to testify, that they preferred not to go further, they would not do further business with the company if Dacey were reemployed"; that Dacey's "untruthfulness prior to going into the service in regard to the business of the defendant caused the defendant no end of nuisance and expense." This evidence was excluded by the court on the ground that the issue whether the veteran was qualified related to his qualifications at the time he sought reemployment; that anterior conduct could not affect such qualifications; that to hold otherwise "would allow every employer to be a judge of whether a man is qualified for a job or not on the basis of their past experience with him". Therefore, the judge ruled that "I will allow you to prove that the man was not qualified to take his position at the time he applied for it after his discharge, but I will not allow you to introduce any evidence of anything that happened prior to the time that he separated from your employ to go into the service." It is our view that the past performance of the veteran in the position, especially conduct of the sort appellant sought to prove, has an obvious bearing upon the issue whether he presently has the qualifications of mind, temperament and character requisite for the position he seeks. Of course it is possible that an employee, during his absence in the service, might have overcome defects in his qualifications previously manifested. But this would be a matter of proof. It is also true that the force of the excluded evidence as to prior conduct tends to be weakened somewhat by the fact that, notwithstanding his alleged manifestations of unfitness, Dacey was retained in employment until he voluntarily left to enter the service. This, however, is a matter going to the weight of the evidence. A counter-consideration would be that an employer, though justifiably dissatisfied with the services of an employee working under a contract for a definite period, might sometimes find it expedient to put up with the employee until his contract runs out rather than risk a lawsuit by discharging him. The proffered evidence above referred to should have been received. To let it in would not "allow every employer to be a judge of whether a man is qualified for a job or not on the basis of their past experience with him". If it had been received, the trial judge would have given it such weight as it deserved, and on the basis of all the evidence would have made the determination whether Dacey was presently qualified.

 One further matter needs to be mentioned, since the case will go back for a new trial. As previously stated there was some evidence that Dacey, when he

saw Griffith in June, 1945, insisted not only upon reemployment in the former position he had held under the expired contract, but also upon being reinstated as a director and vice president. There might be some question whether an elective officer in a corporation, such as the vice president, has a position "in the employ" of the corporation within the meaning of § 8. See McClayton v. W. B. Cassell Co., supra, 66 F. Supp. at pages 171, 172; Houghton v. Texas State Life Ins. Co., D.C.N.D.Tex.1946, 68 F.Supp. 21. We need not decide this, inasmuch as Dacey has not cross-appealed from the judgment because of its not having ordered his reinstatement as vice president. But certainly a director would not in the ordinary usage be regarded as "in the employ" of the corporation, and we believe it to be clear that a director, as such, is not given reemployment rights under the Act. The testimony just referred to related to an alleged demand by Dacey in preliminary negotiations before he had been released from the army. Whether in his formal application for reemployment after his discharge, Dacey maintained his insistence upon being reinstated as a director, we do not know. If he did so, a question would be presented as to the legal effect on his statutory rights of having demanded more than he was entitled to, assuming for present purposes he was otherwise entitled to something. We do not think a veteran necessarily loses all his rights under the Act merely because in applying for reemployment he couples such application with a demand for something he erroneously believes to be his due. If the employer then makes him an offer of reemployment which is in full compliance with the employer's obligation under the Act, and the veteran rejects the offer, then certainly this would foreclose any claim /for interim damages for so long as the veteran stands on such rejection. Whether the veteran could withdraw such rejection, either within or after the 90-day period, and thus reinstate his employment rights, we do not now undertake to decide. But if, in the case supposed, the employer does not make the veteran an offer of reemployment which is in full compliance with the employer's obligation under the Act, then the fact of the veteran's having asked for too much is of no legal consequence; upon a complaint by the veteran under § 8, the court may order his reinstatement to the position to which he is entitled, and may assess appropriate interim damages.

The judgment of the District Court entered June 26, 1946, is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.