BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, Freight Handlers, Express and Station Employes, Petitioner,

v.

RAILWAY EXPRESS AGENCY, INCORPORATED, Defendant.

Civ. No. 3148.

United States District Court
S. D. Ohio, W. D.

Nov. 16, 1955.

Leonard D. Slutz, Harry M. Hoffheimer, Nichols Wood Marx & Ginter, Cincinnati, Ohio, for petitioner.

William A. McKenzie, Graydon, Head & Ritchey, Cincinnati, Ohio, for defendant.

DRUFFEL, District Judge.

This action was brought by petitioner pursuant to the provisions of Section 3 (p) and (q) of the Railway Labor Act, as amended, 44 Stat. 578, 48 Stat. 1189, 45 U.S.C.A. § 153(p) and (q) to enforce an order of the Third Division of the National Railroad Adjustment Board against Railway Express Agency, Inc., with whom petitioner maintains a collective bargaining Agreement concerning rates of pay, rules and working conditions governing defendant's employees, implemented by a Memorandum of Understanding dated August 6, 1942, relating to the seniority rights of such employees who may be affected by the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix § 501 et seq.

Petitioner claims that on November 22, 1940, Robert E. Levy, an employee of defendant with a seniority date of August 16, 1940, the regular occupant of a six-day position titled Relief Sorter at the Seattle, Washington Agency, entered the military service of the United States; that on September 19, 1949, he was released from service in the Army, receiving a discharge "under other than honorable conditions." Petitioner further claims that on November 18, 1949, Levy exhibited his discharge to the General Agent of the Railway Express Agency at Seattle, and requested that he be returned to service with the Agency in accordance with his rights under said Agreement and Memorandum of Understanding, but the Agency refused and declined to honor his request and stated Levy's name would be removed from the Agency's records.

Petitioner further claims that from December 6, 1949, to January 18, 1950, Levy underwent medical treatment, and again on February 10, 1950, requested re-employment with the Agency and was again refused. Thereafter petitioner submitted the dispute to the National Railroad Adjustment Board, Third Division, in accordance with the provisions of the Railway Labor Act.

After presentation and argument of their respective positions by petitioner and the Agency, the National Railroad Adjustment Board, Third Division, having entered the dispute as Docket No. CLX–5295, issued its Award No. 5324,

on April 12, 1951, which found that the Agency had violated its Memorandum of Understanding and the Agreement with the petitioner, and sustained petitioner's claim that Robert E. Levy be permitted to return to service with seniority rights unimpaired and be compensated for full salary loss sustained retroactive to and including February 10, 1950. Said Board, on April 12, 1951, also issued its order to the Agency, directing it to make said award effective and to pay to the employe on or before June 16, 1951, the sum to which he was entitled under the award.

After efforts to adjust the dispute failed, this action to enforce the award was commenced here.

Petitioner, before the Adjustment Board relied upon Rules 29 and 100 of the Collective Bargaining Agreement, of September 1, 1949, and also the Memorandum of Understanding dated August 6, 1942.

Rule 29 reads as follows:

"Except as provided in Rule 27, an employe who has been in the service more than thirty (30) days or whose application has been formally approved shall not be disciplined or dismissed without investigation, at which investigation he may be represented by an employe of his choice or duly accredited representative. He may, however, be held out of service pending such investigation. He shall have at least twenty-four (24) hours' advance notice of such investigation and shall be apprised in writing of the precise charge against him within seven (7) days of knowledge by the Management of the alleged offense. The investigation shall be held within seven (7) days of the date when charged with the offense or held out of service, otherwise the employe, if held out of service shall be returned to his former position and compensated for wage loss sustained. A written decision will be rendered within seven (7) days after completion of investigation.

"Note: The management agrees that in its instructions respecting this rule, it will advise that the suspension feature of the rule is permissive and not mandatory, and is not expected to be invoked where trivial offenses or minor infraction of rules are involved." (Pltf.Ex. 1)

Rule 100 reads as follows:

This Agreement shall be effective as of September 1, 1949, and shall continue in effect until it is changed as provided herein, or under the provisions of the amended Railway Labor Act.

"Should either of the parties to this Agreement desire to revise or modify these rules, thirty (30) days' written advance notice, containing the proposed changes shall be given and conferences shall be held immediately on the expiration of said notice unless another date is mutually agreed upon." (Pltf.Ex. 1)

The controlling part of the Memorandum of Understanding (Pltf.Ex. 2) reads as follows:

"Pursuant to Federal legislation (i. e., Public Resolution No. 96 of the 76th Congress [54 Stat. 858], and Selective Training and Service Act of 1940) any employe of Railway Express Agency who has established a seniority date and who shall be ordered or inducted into the land or naval forces in accordance with such legislation, or has enlisted in the land or naval forces after the declaration of the existence of an emergency by the President of the United States on September 8, 1939, shall, upon completion of such service in the land or naval forces, be restored to such position with Railway Express Agency (including rights to promotion) to which his accumulated seniority entitles him, all in accordance with the then ex-

isting rules of the schedule agreement, the same as if he had remained in the service (such right to be exercised by the individual within five days from his reporting for duty), *provided, upon completion of his service he receives from the Government a certificate as provided by the law, or other proper evidence of release, is still qualified to perform the duties of such position*, makes application for return to service within forty days after he is released from such training and service, * * *" (Emphasis added)

From the evidence presented in the District Court, also the record before the Adjustment Board (Pltf.'s Ex. 9), it appears among other things that Robert E. Levy, defendant's employee, entered the service of the United States Army, November 22, 1940, as a Lieutenant, serving in many areas between that time and 1949, meanwhile advancing through grades until he was advanced to the rank of major.

At the time of the incident which led to his severance from the Army, he was serving as a major in Germany. Levy's testimony concerning it may be summarized as follows: In January, 1949, while on a weekend recreation trip to Italy in his automobile he was stopped by Swiss customs officials, who "found some cameras and what amounted to a box of ball bearings in my automobile. They did not arrest me, but said they were going to—I would have to pay a duty. * * * I was very indignant about that and put up quite an argument with the Swiss customs officials, which they didn't like or appreciate. At any rate, I had my choice of paying the customs charge, * * * before being able to proceed further into Italy. So I paid * * * less than $25.00 * * *" (Pltf.'s Ex. 10, pages 26 and 27).

Sometime thereafter, Levy was called to the office of the Commanding General, who "severely upbraided me for the in-

cident that had taken place over six months previously at the Swiss border." (Pltf.'s Ex. 10, page 30). At a result of which the General gave Levy the alternative of either standing court-martial or resigning. As already appears, Levy resigned, and was given a discharge under other than honorable conditions from the Armed Forces of the United States of America.

As bearing on the seriousness of the incident (involving a United States Army Major), it would seem Levy's testimony is very important.

"Q. Where were you going with the ball bearings? A. Well, I took those over at the request of some people concerned with the war in Israel, for the purpose of taking them to Italy, for transshipment to Israel. There was an Israli war on. There was no pay or profit in connection with that. * * *

"Q. To whom did they belong? A. Well, specifically, I cannot say. I never did know. I know the name of the people who requested me to take them to Italy, and I know to whom I was to give them, but whether these people specifically owned the ball bearings or not, I cannot say. * * * They were to be used in some machinery or mechanism in connection with the Israeli war."

(Pltf.'s Ex. 10, pages 35 and 36)

From the evidence it also appears that Levy sought to withdraw his resignation, and in response thereto, the Army file shows the reason for Levy's separation:

"* * * Resignation for the good of the service, in lieu of trial by court-martial, on a charge of transporting contraband from Munich, Germany, across the Swiss borders to Milan, Italy, * * * that his request for withdrawal of his resignation is not favorably considered by the Department of the

Army. \* \* \*" (Defendant's Exhibit C)

The Railway Express Agency contended before the Board and here "That one of the prerequisites for re-employment is that the veteran 'satisfactorily completes his period of training and service.' What is considered to be a 'satisfactory completion of training' is evidenced by the form of discharge given the veteran by the branch of the armed services in which he served. The discharge of an officer of the Army of the United States 'under other than honorable conditions' is not evidence that the officer has 'satisfactorily completed his period of training and service.'" (Pltf.'s Ex. 9, page 10)

That notwithstanding their refusal to re-employ Levy, as indicative of the Carrier's attitude toward cooperating with Mr. Levy, the following letter, dated March 7, 1950, from General Manager L. P. Bergman to General Chairman T. E. Hinton is quoted below:

"Your letter March 1:

"Our interpretation of the Memorandum of Understanding dated August 6, 1942, is that it contemplates the certificates provided by law necessarily must be such certificates, letters, or other documents which under the law entitles the holder to re-employment rights. The local expert of the Veterans Administration informs me that a discharge under other than honorable conditions does not entitle a veteran to re-employment rights.

"I think we have been very fair in this case. We have offered to consider Mr. Levy's re-employment if he will give us a release authorizing the Adjutant General to inform us re the conditions under which Mr. Levy's severance from the service was consummated. If Mr. Levy will provide us with such a release and we can satisfy ourselves that the conditions under which he was released from the service were such as would not militate against his re-employment with the Company, we will restore him to his rights at Seattle. Failing in that, or until such time as he is able to present an honorable discharge, we will sustain Mr. Hore's decision. The Veterans Administration representative here informs me it is possible Mr. Levy may at some future date be able to secure an honorable discharge, and if he can present such a document we will be glad to restore him to his seniority status at Seattle."

(Pltf.'s Ex. 9, pages 12 and 13)

In addition to the foregoing, defendant also offered evidence here that a sorter's job (Levy's) required him to handle all kinds of valuables; that it necessitates one to be above reproach and honest in every respect.

### Findings of Fact

From a careful consideration of the evidence and the entire record, this Court finds as a matter of fact:

1. That the Railroad Adjustment Board was in error in holding that defendant violated Rules 29 and 100, in that Levy was not an employee within the meaning of the Memorandum of Understanding, for the reason that he failed to present a Government certificate as provided by the law, as a condition precedent to his re-employment.

2. That the language "or other proper evidence of release" in the Memorandum is ineffective in attempting to broaden the Congressional intention as indicated by the Selective Training and Service Act, to include those who have served their country without honor.

The term "or other" has been construed often. In Hickman v. Cabot, 4 Cir., 183 F. 747, the Court held "that the words 'other cause,' following 'fire and explosion,' should be construed to mean other cause similar to fire or explosion

under the rule of ejusdem generis," and continued on page 749: "As the agreement was construed below, it means the same thing that it would have meant had it read 'if by reason of any cause.'"

To the same effect is Freeland v. Freeland, 6 Cir., 110 F.2d 966(3), "Where there are general and special provisions relating to the same thing, the special provisions control."

The Memorandum of Understanding (Pltf.'s Ex. 2) begins: "Pursuant to Federal legislation." Pursuant, according to Webster's means: "Acting or done in consequence or in prosecution (of anything); hence, agreeable; conformable; following; according."

█ So it would definitely appear from the foregoing that the parties at the time of the signing intended to conform to the law.

That this is so, is further strengthened by the following self-explanatory letter of March 6, 1945:

"*National Defense.* 137–2–12

"March 6, 1945.

"Mr. A. M. Hartung, Vice President,
"Railway Express Agency, Rm. 546
"New York 17, N. Y.
"Dear Sir:

"With reference to the Memorandum of Understanding executed August 6, 1942, having for its purpose the protection of the seniority rights of employes inducted into military service, later amended to include employes of the Merchant Marine.

"Public Law No. 473 of the 78th Congress, approved December 8, 1944 [58 Stat. 798], extended the period of time in which discharged service men are required to report for work from forty days to ninety days and added a provision that they may report for work ninety days after release from hospitalization continuing after discharge for a period of not more than one year.

"*In order that our agreement may harmonize with the law,* it will be necessary that some arrangements be made to extend the period set forth in the agreement to ninety days after release from service, or ninety days after release from hospitalization, as above stated.

"If you are agreeable to this amendment to the agreement, a letter to that effect will, in my opinion, be sufficient to make the correction. Please advise.

"Yours very truly,
"Vice Grand President"

(Emphasis added) (Pltf.'s Ex. 7)

This was before the Levy incident arose, and it also appears significant that the writer of this letter was also the author of the Memorandum of Understanding.

3. The Memorandum of Understanding also requires that the individual applying "is still qualified to perform the duties of such position."

The evidence presented here shows that the position of sorter requires the handling of all kinds of valuables for defendant, and necessitates a person above reproach and honest in every respect. This requirement hardly fits a person, who with the rank of Major in the United States Army, admits running contraband to another country at war, contrary to law and United States Army regulations, and who resigns his commission rather than face court-martial.

█ Further, under all the circumstances, this Court has no alternative but to also find as a matter of fact that Levy, by his admitted misconduct disqualified himself for re-employment as a sorter under the Memorandum of Understanding.

"The word 'qualified' as used in provision of the Selective Service Act requiring an employer to reemploy a veteran still qualified to perform duties of his position, means more than simply physically and

mentally qualified, and includes temperamental elements consistent with harmonious relations and mutual trust and confidence."

Trusteed Funds, Inc., v. Dacey, 1 Cir., 160 F.2d 413, 414 (8). See also McClayton v. W. B. Cassell Co., D.C., 66 F.Supp. 165.

4. Although Sec. 153(p), Title 45 U. S.C.A., provides among other things, " * * * that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated.", a careful examination of the record before the Adjustment Board and here, fails to show any evidence whatsoever that the parties to the Memorandum of Understanding had any intention of broadening the law to the extent of including employees with a discharge certificate under other than honorable conditions. All that appears in evidence is the bare Memorandum of Understanding, which speaks for itself, plus the fact that Levy applied for re-employment on two separate dates and was refused for lack of a certificate provided by the law.

To sustain the Adjustment Board's Award on the record here, as indicated by a portion of its fallacious opinion:

> "It is of no concern to this Board in what manner the Courts of our land and various and divers governmental agencies construe and interpret statutes, likewise it is indisputable this Board possesses the sole authority to construe and interpret the Schedule here involved." (Pltf.'s Ex. 9, page 14)

would be contrary to sound judicial procedure and an affront to the millions of the American forces who have served their country with honor.

Under these circumstances, this court finds additionally that petitioner has failed to sustain its burden of proof either before the National Railroad Adjustment Board or before this court.

### Conclusions of Law

Wherefore this court concludes as a matter of law that the decision and award of the Adjustment Board to Levy, which now approximates $20,000, and which increases by $324.42 per month, was erroneously made and is hereby set aside and held for naught, and judgment is awarded defendant Railway Express Agency, Incorporated, for its costs.

A judgment entry may be prepared in accordance herewith.