Anthony Kyle WINFREE, Plaintiff,

v.

MORRISON INCORPORATED d/b/a Ruby Tuesday, Defendant.

No. CIV-1-88-344.

United States District Court,
E.D. Tennessee, S.D.

March 20, 1990.

Steve McKnight, John Mac Coon, Asst. U.S. Atty., Theresa Ball, U.S. Dept. of Labor, Office of the Sol., Nashville, Tenn., for plaintiff.

Cornelius R. Heusel, N. Victoria Holladay, Kullman, Inman, Bee & Downing, New Orleans, La., for defendant.

### MEMORANDUM

EDGAR, District Judge.

Plaintiff Anthony K. Winfree brings this action pursuant to 38 U.S.C. § 2022 seeking wages lost as a result of defendant Morrison Incorporated's alleged violation of the Veterans Reemployment Rights Act. The Court conducted a bench trial on March 14 and 15, 1990. For the reasons that follow, this suit will be DISMISSED.

## I. *Facts*

Morrison owns and operates various restaurants and cafeterias. Among these is a chain of restaurants known as Ruby Tuesday. Plaintiff Winfree began working at Ruby Tuesday restaurants in Knoxville, Tennessee, while he was a student there at the University of Tennessee. In early 1986, he was working at the Ruby Tuesday restaurant on Brainerd Road in Chattanooga, Tennessee, as one of several assistant managers. His immediate superior was the restaurant manager, Walter Grayson. Next above Grayson in the chain of command was Mark Ingram, the area manager, who was responsible for the Brainerd Road restaurant, as well as other Ruby Tuesday restaurants in the area.

In January 1986, Winfree advised Grayson that he had enlisted in the Marine Corps Reserves delayed entry program and that he would be leaving in June 1986 for approximately six months active duty in the Marine Corps. Prior to that time, Winfree's performance as an assistant manager had been average. From this point on, however, Winfree's service as an employee went steadily downhill.

One manifestation of this decline was that Winfree carried or possessed a number of weapons in and around the restaurant from time to time. These included a nine-millimeter Taurus pistol, an AR–15 assault rifle, a .22 rifle, and other weapons such as a butterfly knife and Japanese "throwing stars." Sometime in the spring of 1986, he was arrested by National Park Police at Lookout Mountain, Tennessee, for unlawfully carrying a .45–caliber weapon in his vehicle. At that time, Winfree also had the nine-millimeter Taurus on his person. This was apparently not detected by park police. At some point, Winfree attempted to fashion a silencer for the .22 rifle, and actually tested the silencer by shooting the weapon in the basement of the restaurant.[1]

On at least one other occasion, Winfree carried a pistol into a Chattanooga bar.[2]

Winfree decided to get into the boot camp frame of mind early. He wore camouflage combat fatigues to work and obtained a burr haircut. Meanwhile, his work performance slipped noticeably. He was short tempered with other employees and developed a "hit list" which he talked about to fellow employees. Among those on the "hit list" were Grayson and Ingram. People moved up and down the list depending on what they had done to Winfree in the recent past. Even though he was an assistant manager, Winfree more than once served liquor in the restaurant to his under-aged girlfriend in violation of state law and restaurant policy.

On February 14, 1986, Winfree was given an evaluation by Grayson which, especially under the category of Management Skills, found Winfree obviously lacking. For the most part, this evaluation showed that the plaintiff "needed improvement." Listed as "totally unsatisfactory" was "Leadership." On this point, the evaluation says, "Respect of employees and managers has gone down drastically in last couple of months. No. 1 priority."

Meanwhile, Winfree and others, including a fellow employee, were vying for the attentions of a young woman. At one point, while this female was at her apartment with the other employee, Jeff Francis, Winfree came to the apartment, beat on the door, said he had an M–16 in his trunk and would kill Francis. Happily, no violence actually resulted. The young woman declined Winfree's offer of marriage but, according to Winfree, said that she would wait for him while he did his Marine Corps service.

Morrison did not terminate Winfree before he left for the Marines in June 1986. Morrison, of course, knew that Winfree

---

**1.** The record does not reveal whether this silencer was ever registered to Winfree as required by 26 U.S.C. § 5845(a) and 26 U.S.C. § 5861(b).

**2.** The weapons were on Ruby Tuesday property in violation of company policy. The manager and other assistant managers also occasionally

had weapons on the property, primarily for protection of cash receipts at the end of the day. The evidence is inconclusive as to whether the plaintiff continued to carry weapons on company property after being explicitly advised of the company policy.

was going into the Marines and just hoped that he wouldn't come back.

While Winfree was doing his tour in the Marines, he corresponded with a female friend of his, Beverly Weathers, who was a fellow assistant manager at Ruby Tuesday. When Winfree was informed that his "waiting" young woman had married a Jeff Wells, he wrote Weathers,

All of this is making me think serious weird thoughts too. Don't laugh (you probably won't since this is me) but I had thoughts of eliminating Jeff Wells before I left. Somehow, no matter what Ronna said, I still felt him to be a threat. Gee, I guess I should've listened to myself. Unfortunately, I didn't have the resources then to do the job like I do now.

In another letter, he wrote:

I really miss you and everyone at Rubes, even "Fat Boy"![3] I guess the old crew keeps thinning out. Hey, if you hear Ingram talking any shit about me let me know; if you want rid of him, let me know, I can take care of it now! Yes, the Marines will teach you to kill!

Weathers was understandably concerned about this. On the one hand, she did not want to reveal the contents of personal correspondence with her friend. On the other hand, she was very much concerned about Winfree and about what he might do to someone if he came back to work at Ruby Tuesday. She gave these letters[4] to Walter Grayson. When Winfree applied for reemployment at Ruby Tuesday in October 1986, Morrison became justifiably concerned about the safety of its employees and decided to deny Winfree reinstatement as an employee when he completed his tour of duty in November. Morrison so informed Winfree. Before Morrison made this decision, however, it obtained the advice of an attorney in Washington, D.C. who spoke with someone at the U.S. Department of Labor regarding whether Morrison was obliged to reemploy Winfree under these circumstances. Morrison received advice that it did not have to reemploy Winfree.

Morrison did not want Winfree to know that Weathers had turned over the letters because it, and Weathers, were very concerned about what Winfree might do. Morrison advised Winfree that he would not be rehired because of his "work performance and attitude." Winfree was advised not to go on company property or to contact any local or area management of the company. Winfree did so anyway twice: once to pick up an employment application and once just for the heck of it. The second time he was advised to leave. When he refused to do so, the police were called, whereupon Winfree disappeared.

The investigation conducted by the United States Department of Labor ("USDOL") of Winfree's veterans reemployment complaint was shoddy and insensitive. Morrison attempted to protect Weathers and its other employees by giving copies of the letters to USDOL personnel in Washington, D.C., rather than to the USDOL area agent, who was headquartered in Nashville, Tennessee. The area agent, apparently in a bit of turf pique, and with full knowledge of the possible risk that release of the identity of the recipient of the letters might entail, nevertheless revealed all to Winfree. To make matters worse, the regional investigator then made a phone call to Weathers wanting to know why she would do such a disloyal thing to turn over Winfree's letters to Morrison, and advised Weathers that the USDOL could obtain another job for her if she (Weathers) was being pressured by Morrison. On April 8, 1987, the USDOL, without interviewing a single Morrison management employee, advised Morrison's counsel that it had until April 22, 1987, to reinstate Winfree, or the matter would be referred to the U.S. Department of Justice for suit. This case was filed in this Court on August 19, 1988. Technically, the U.S. Attorney filed the case. However, most of the pleadings are signed by the Office of the Solicitor of the U.S. Department of Labor, and the Solici-

---

**3.** Store manager, Walter Grayson.

**4.** Actually, one letter and a page from another letter.

tor's Office represented Winfree in this Court at the trial.

It should also be noted that after the conclusion of its "investigation," but well before suit was filed, the USDOL knew that Gary Gerbitz, District Attorney General for Hamilton County, Tennessee, at Morrison's request had referred Winfree's letters to Mr. Walter Michulick, who has a masters degree in clinical psychology and who often consults with local law enforcement upon various matters, including threat analysis. Mr. Michulick had concluded in a report dated December 2, 1989, that:

> After reading your letter and the copies of Mr. Winfree's letters, certain facts stood out. First, the contents of the letters suggest violent thoughts. We now know that he is able to take violent thoughts which most men have and reduce them to writing, thus making them more solid. This coupled with his training will allow these thoughts to be made operational. With this type of background, the only thing left before acting out, is a situation which would call for violence in his mind.

> His relations with women as indicated by his letters suggests a need for security and a need to impress. If he is trying to impress, I can see little problem. If he feels that his security is being threatened, then everything is in place for him to act on it.

> After he completes his training as a zealot Marine, if he is still unable to transfer his affections to "BELV" or other women, I can see his former girlfriend and Mr. Wells being at risk. I do not see the violence reaching the level of murder as a planned act. I do believe that physical contact is evident and may run its course to the point of a lethal act.

## II. *Legal Analysis*

■ Winfree is entitled to the protection of the Veterans Reemployment Rights Act by virtue of 38 U.S.C. § 2024(c) in that he as a member of a reserve component of the Armed Forces, was on active duty for 12 consecutive weeks, and made timely application for reemployment.

38 U.S.C. § 2021(a)(B)(i) provides that the plaintiff "if still qualified to perform the duties of such position, be restored by such employer to the employer's successor in interest to such position or to a position of like seniority, status and pay...." 38 U.S.C. § 2021(b)(3) further provides that those who are reinstated by the employer "shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces."

■ It is clear that the Veterans Reemployment Rights Act is designed to protect veterans, including reservists and guardsmen, from discrimination arising from their military duties. *Monroe v. Standard Oil Co.*, 452 U.S. 549, 558–559, 101 S.Ct. 2510, 2516, 69 L.Ed.2d 226 (1981); *Burkart v. Post–Browning, Inc.*, 859 F.2d 1245, 1247 (6th Cir.1988). It follows then, that if adverse action taken by the employer is not motivated by a veteran's military service, then the employee is not entitled to relief under this statute. *Burkart*, 859 F.2d at 1250. There is no need to determine in this case whether the burden of proof should be allocated as it is under Title VII of the Civil Rights Act of 1964, *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), or in some other manner. Regardless of who has the burden of proof in this case, it is clear that Morrison's failure to reemploy Winfree was not causally related to his service in the United States Marine Corps. *See Henry v. Anderson County*, 522 F.Supp. 1112, 1115 (E.D.Tenn.1981). Morrison refused to reinstate Winfree because he was not a good performer prior to his departure and because it had genuine fears about the safety of its employees as a result of matters which occurred after he entered active duty with the Marines.

It may well be that Morrison's fears were unjustified. We can all certainly hope so. Nevertheless, under these facts, Morrison was clearly warranted in taking

the action it did. There is nothing wrong with being a gung ho Marine. This country needs them. However, an employer can reasonably expect a Marine or any other serviceperson to confine military service to the military. Moreover, it goes without saying that service in the Armed Forces of this country does not include even idle talk about harming civilians.

An appropriate judgment will enter.

## JUDGMENT

For the reasons expressed in the memorandum opinion filed herewith, judgment is entered for the defendant. Since the United States Department of Labor is a real party in interest, *see Taylor v. Perini*, 503 F.2d 899 (6th Cir.1974), costs are assessed against the United States Department of Labor in accordance with 28 U.S.C. § 2412.

SO ORDERED.